Good morning. We have one case on the calendar today. Leavitt v. Arave. I believe the state is the appellant here. You may proceed. Please, the court. In 1985, September of 1985, Richard Leavitt went to trial after he had brutally murdered Danette Elg. Immediately after the jury had been sworn, but prior to the presentation of any evidence, instruction 12 was read to the jury. A presumption of innocence instruction. That had been used throughout the land, throughout the country, for a number of years, and in fact had been approved by a majority of jurisdictions across the country at that time. As a result of that instruction, however, nearly 15 years later, Federal District Judge B. Lynn Windmill concluded that that presumption of innocence instruction resulted in a due process violation, despite the fact that at the time that Mr. Leavitt's conviction became final in 1989, that instruction, as I stated, in fact, was used by and had been approved by a majority of jurisdictions. You don't dispute that it is wrong today? I'm sorry, Your Honor? You do not dispute that it is erroneous today, that today it's clearly wrong? Well, Your Honor, actually, I do have to dispute that because as late as 1999, at least in the State of Connecticut, the State of Connecticut had reviewed a number of cases throughout the country and had concluded that as late as that time, that the instruction did not constitute a due process violation. Now, I recognize that in a direct review case in the Ninth Circuit in 1956, in the Reynolds case, that this Court, in fact, concluded that it was a violation, could be. It wasn't. But you don't think Cage itself in 1990 rendered this instruction erroneous? I do not, Your Honor, because Cage was a reasonable doubt instruction. We're talking here about a presumption of innocence instruction. Well, sort of. You're talking about presumption of innocence in connection with the burden of proof. It says both, unlike some, which just talk about the presumption of innocence, unlike Reynolds. That may very well be, Your Honor, which ties in, of course, with the argument that when you look at the totality of the instructions that were given here. That's a different issue. It is. And it's a different question from the one I think that Judge Kuczynski was asking, which is 12 standing alone. 12 standing alone, as I said, Your Honor, at least in Connecticut as late as 1999, it was determined that there was nothing wrong with that instruction. And we know that I believe. Which case is that? It was an affirmance of Kerry, Your Honor. I believe it was the Kerry decision. It is cited in our brief. It was a reaffirmance of the Connecticut Supreme Court in 1972 first discussed it, and then it was reaffirmed in Kerry. It was in 1999. Kerry was reaffirmed. We know that as late as 1996, which I believe was post-Kage, that two Federal circuits, the Second and the Tenth, had actually approved the use of the instruction. Now, I realize that Doyle subsequently changed that, but Doyle was. You said it was in your brief? I'm sorry, Your Honor? You say Kerry is in your brief? I believe it is, Your Honor. I believe me if you don't know. Yes, it is, Your Honor. Yes, it is. How do you spell that? C-A-R-I, out of Connecticut, Your Honor. Is it State v. Kerry or something? I don't see it in there. Maybe it's State v. Kerry. Any blue brief? State v. Kerry is on page 23 of our brief, Your Honor. You have two briefs. Yes. It's in our reply brief, Your Honor, our great package brief, the big one. Okay. Go ahead. Thank you, Your Honor. However, it really doesn't matter if the instruction's standing alone. Well, the case you cite, oh, I see. The Kerry case you cite on page 23 is a 1972 case. Yes, Your Honor. But I believe that we cited, if I can find it here, is it Chiappa? Yes. That's the one that actually reaffirmed Kerry. That is the case, Your Honor, out of Connecticut. And it reaffirmed the Kerry opinion from 1972. Okay. Go ahead. Thank you. Irrespective of whether the instruction standing alone today is erroneous or not, it would certainly constitute a new rule in violation of the law. Well, it depends a bit on if it's not okay today as to when it became not okay, which raises the question of when the Petitioner's conviction became final. Yes, Your Honor. Why didn't it become final at the time that his resentencing became final? Because, Your Honor, I believe we discussed in our reply brief the footnote out of Brady that talks about the fact that the general rule of finality does not apply when the particular issue is independent of and unaffected by what may transpire at the particular hearing. And in this case, what we had, his convictions had been affirmed and everything was fine except for the resentencing. Well, but the case was not final. There was no final judgment in his case until denial of his petition in the resentencing. The case was still intercolloquial at that point. And what I'm saying, Your Honor, is there is an exception to that general rule based upon Brady and the other cases that we cited in our brief. Gretzler. I'm sorry, Your Honor. Gretzler, Ninth Circuit case. I believe so, Your Honor, yes. And that exception would apply in this particular case, because all of the ‑‑ and I recognize that a, quote, final judgment had not been entered. But for purposes of Teague, we don't need to look at the final judgment. In fact, if you look at finality for purposes of Teague, we're looking at when the petition for cert or the decision on cert. Now, Brady was not a Teague case because it was way before Teague. No, it was not, Your Honor. So it was not considering finality for purposes of Teague. Why does it ‑‑ why does Brady apply to a Teague finality question? Because it was specifically discussed in Brady, and it has also been discussed, I believe ‑‑ I'm sorry. Teague was specifically discussed in Brady? Well, the issue of finality was discussed. But my question was, why would the finality discussion in Brady apply in a Teague context? It is dealt with in a specific context where the question was whether or not this appeal would be considered given the protracted proceedings on remand. And it was not a Teague analysis. I understand that, Your Honor. But based upon Brady, this Court in the Phillips v. Vasquez case actually relied upon that type of analysis to conclude that there wasn't, I guess I'll call it an exception to the, quote, finality rule that was originally discussed in Teague. And, in fact, the Court noted that the Supreme Court in Brady had explicitly rejected the notion that final judgment always means sentence when, as here, the conviction and sentencing procedures are bifurcated. And that is ‑‑ Could the Idaho Supreme Court have gone back and reconsidered the issue in its second appeal? Absolutely not, Your Honor. In fact, in Creech v. State, which is cited on our brief on page 21, Creech ended up having to be resentenced. And when he brought up issues from his guilt phase, he pled guilty, but the guilt phase aspect of his case, the Idaho Supreme Court specifically rejected those claims and said, we can't consider those claims. You have already raised those claims, and the only thing that we are going to consider in this appeal from resentencing are resentencing issues. It says we can't or we won't? I'm not going to go so far, Your Honor, to say that in Creech they said they can't. But you did say exactly that. I will say they won't, because I believe in that. So you overstated when you said they said they can't? The court couldn't. The Idaho Supreme Court couldn't. I'm asking a question. Yes, Your Honor. Okay. You understand the importance of not overstating authority? Yes, Your Honor. Okay. So why don't we start again? The question I ask you is may or could the Idaho Supreme Court have reconsidered the guilt phase issues in its second? The Idaho Supreme Court obviously can make exceptions to any rule that it has. But the rules and the cases that we have. Is that a yes? Yes, Your Honor. Okay. So given that that is the case, why is the finality, given the case is still in the process where it can be, the issue can be reconsidered by the state court, why isn't the finality determined at the point when that process is finished for teeth purposes? Because, Your Honor, the Idaho Supreme Court. I mean, for example, if there had been a significant intervening Supreme Court opinion directly on point, one would guess that the Idaho Supreme Court would have, since you say they can and you admit they can, would have gone back and said, gee, we goofed the first time. We, you know, we now, there is an intervening Supreme Court of the United States opinion. We're going to go back and reconsider the issue we considered in the first appeal. It could do that. And presumably justices of Idaho Supreme Court are sworn to uphold the United States Constitution, just like we are, and they would do that, wouldn't they? The Supreme Court, Idaho Supreme Court could do that. Yes, Your Honor. I would do that if there were a Supreme Court opinion directly on point. I mean, you don't have any doubt about your State Supreme Court doing what it required, do you? No, Your Honor. And, in fact, on the certiorari petition, that issue could have been raised in a cert petition to the United States Supreme Court from the second appeal, couldn't it? I'm not sure I know the answer to that, Your Honor. I don't believe so, Your Honor. But in fairness, I don't. If the petitioner raises it in the second case, in the second appeal and says, you know, you've considered it once already. Here's an intervening Supreme Court opinion. You should go back and reconsider. Idaho Supreme Court takes a look at it and says, no, we're not going to go back and reconsider. Presumably that's reviewable by the United States Supreme Court. If there is an intervening Supreme Court decision, yes, Your Honor. Whether there is or not. Yes, Your Honor. Right? If he raises it and that's reviewable. So why isn't it fatigue purposes? Why isn't that the end point? The State process has come to an end, and at that point it's final, and at that point is the last point at which the State courts could have corrected any error. Your Honor, it's because of the way we – the way the statute was set up with the bifurcated  And I understand what the Court is saying. I'm sorry, which statute? In Idaho, you have the trial phase, and then you have the sentencing phase. I think that happens in every case. Yes. Every State where there's a death. I've never heard of a State that has a unified trial and sentencing and penalty and – But what I'm saying, Your Honor, is that it is undisputed that all of the issues associated with the guilt phase were resolved, and all we had to deal with was sentencing. But above and beyond that, Your Honor, even if we assume for the sake of argument that finality didn't occur until after Cage was released, we still have the United States Supreme Court decision in Tyler v. Cain which says that Cage itself is not retroactive. And so it really doesn't matter for purposes of – But what it said was that it hadn't made Cage retroactive. It doesn't hold that Cage was not retroactive. That's true, Your Honor, but there are numerous courts that have relied upon that language. In fact, although I can't cite one – I'm not talking about the spirit of the case. I'm talking about the fact it did not hold that Cage was not retroactive. That's fair, Your Honor, yes. But – You're overstating the case a little bit again, huh? Yes. Apparently so, Your Honor. My apologies. You need to be very careful about that. Yes, Your Honor. Because we actually read these cases, you know. I understand that, Your Honor. I know you didn't, Your Honor. You can say that Tyler has emanations that suggest the Supreme Court doubts that it would be retroactive for Teague purposes, but I don't think you can say more than that. Fair enough, Your Honor. Fair enough. Let me ask you sort of a related question. The State is not arguing as to – as to Destruction 12 is not, I understand, arguing either procedural default or failure to exhaust. That is correct, Your Honor, not before this Court. Is there some hidden hedge there, not before this Court? You're not now arguing – We're not raising that before this Court, no, Your Honor. It was raised below, but we are not raising that before this Court, no. So you are not disputing exhaustion or procedural default. You are – you are raising it as to – you are raising procedural default as to Destruction 39. No, Your Honor. It's not procedural default. It's an independent Federal habeas invited air doctrine that we're raising it. It is the – I'm sorry. So you're not raising either exhaustion or Federal or procedural default, State procedural default as to Destruction 39. I understand you have a separate argument as to 39 on invited air. That is correct, Your Honor. Okay. I mean, I – that's a perfectly fine concession. I'm just sort of wondering, did the State courts ever look at these issues, in fact? Your Honor, before the district court, we argued that the court had not – the State court had not. But the district court concluded based upon some very unique language in Levitt 1. The one paragraph on Levitt 1, and, again, I'm not – if that's what you concede, I'm not going to go, you know, go behind that. But mostly I just want to make sure that there's not any place – we have seen everything. We've read Levitt 1 and Levitt 2. That's all there is. There isn't some other – No, Your Honor. There's no other. Habeas proceeding or something else that we have that addresses, actually addresses these instructions. There is not, Your Honor.  I'm sorry. Go ahead. That's fine, Your Honor. Your Honor, I think I've discussed the landscape at the time that Levitt's conviction became final, regardless of – I don't know whether Gibbs's instruction, I gather. I don't want to overstate that, Your Honor. I don't believe so. Please don't overstate it. I don't believe so. But in recent appeals that I have seen in jury instructions, I've not seen a challenge based upon that instruction. I do know, however, Your Honor, that it was given in the 80s in other cases, particularly in the eastern part of the State and in other death penalty cases that are pending before our district court, federal district court. It was – And was never objected to. And was never objected to. Let me back up. Not that I am aware of was ever objected to. There are no opinions from the Idaho Supreme – or the Idaho appellate courts that discuss this instruction that I have found, at least. Still, it's a pretty troubling instruction. I can appreciate that, Your Honor. Nevertheless, as I said, at least in the context of the other instructions that are given, we don't believe that there was a due process. I mean, when coupled particularly with the alibi instruction, that clearly seems to shift the burden of proving alibi to the defendant. So the two in tandem – and I realize you've got a procedural objection to 239, but just gently skipping over that for the time being – if you just combine the two of them, it does make one doubt whether the jury was properly instructed as to the unmitigated burden that the prosecution has in every criminal case. You do not dispute – just skipping again to instruction 39 – you do not, I think, dispute Petitioner's position that this is not one of those affirmative defenses as to which the State may shift the burden to the defendant. We have argued, Your Honor, in our brief, that instruction 39 did not shift the burden of proving essential elements. Rather, it merely explained that Levitt was raising an alibi defense. I understand you argued that, but I really was asking a separate question. Oh, I'm sorry. You do agree – and if you don't, just tell me. I'm not trying to put words in your mouth. But I understand you not to be disputing that if this is a burden-shifting instruction, it was wrong. Yes, Your Honor, it was. Alibi is not something as to which the State can shift burden. That is correct, Your Honor. There's no question about that. We do dispute whether it was or not. And can you tell me quickly why you think it's not? Because, as I stated, Your Honor, the instruction itself, when you look at it alone without considering the other instructions, merely was advising that Levitt was raising the alibi defense and that he didn't have to prove it beyond a reasonable doubt, and that alibi had to be considered as a whole with the rest of the evidence in determining whether there was a reasonable doubt as to whether he had committed the murder or not. And when you particularly consider that instruction in tandem with the other instructions Well, it says you are further instructed that an alibi is an affirmative defense. It used the word affirmative defense, and then it says it is incumbent upon the defendant when he relies upon the defense of an alibi to prove it, not beyond a reasonable doubt, not upon the evidence, but by such evidence and to such degree of certainty as will, when the whole evidence is considered, create and leave in the minds of the jury a reasonable doubt of his guilt. So he has to create a reasonable doubt. I don't believe that that's what the instruction is saying, Your Honor. I think I just read it. And you did, Your Honor. And perhaps we can just agree to disagree as to the actual interpretation of the instruction. I'm sorry. What is it that we are disagreeing about? Well, I think that you have to look at the instruction as a whole. And when it says when the whole evidence is considered, and that's the phrase that I'm keying in on, is when you look at the whole evidence, it's whether that alibi, in tandem with other evidence, whether the State has proven its case beyond a reasonable doubt. I'm sorry. You don't think this instruction puts a burden on the defendant? I do not think it does, Your Honor. It says it is incumbent upon the defendant. It's an affirmative defense, and it is incumbent upon the defendant to prove it. Do you think that doesn't put a burden on the defendant? I think, again, you have to look at the instruction as a whole. And I realize that you're parsing parts of it and I'm parsing, taking parts of it. But when you look at it as a whole, I don't believe that it necessarily requires the defendant to present anything. I don't believe that a jury would necessarily know what a, quote, affirmative offense even, a defense even is. But as I said, above and beyond that, when you look at the rest of the instructions, particularly regarding reasonable doubt, and the State's burden, the elements instructions, the State's burden to prove all of the elements, I don't believe that that instruction results in a due process violation. Did he, in fact, present an alibi, evidence as an alibi? That's an interesting question, Your Honor. And the reason I say that is because he testified at trial and said that he was with his wife that night, but his wife never testified. I guess. That's sort of my question. Is it an alibi if you say I was, usually you think of an alibi instruction if somebody comes in and says, oh, you know, I was with, I was home with mother and mother comes in and says, yes, I was, we were watching that Sullivan show, whatever, you know, on television. But I guess he places himself in a different place. That is correct, Your Honor. And I guess arguably that is an alibi. I don't believe he really presented an alibi defense. I believe that he presented a defense of I didn't do it. I wasn't there. Now, maybe we're playing semantics of I wasn't there, I was somewhere else. But I agree with you, Your Honor, in that in an alibi defense, usually I've come someone come in and say he was with me. Well, he presented enough that if he asked for an instruction, he would get it. And he did ask for an instruction and he got it. He did, Your Honor. So Idaho courts at least thought that whatever you call this thing, he said enough that if he wanted an alibi instruction, he could ask for it and he got it. That is correct, Your Honor.  That is correct, Your Honor. But, you know, alibi really is a, I don't consider alibi to be a subset of anything. I think it's a simple situation of I didn't do it, somebody else did it, I wasn't there. But he did get the instruction in this particular case, Your Honor. If there are no other questions, Your Honors, I'd like to reserve some of my time to respond to some of the cross-appeal issues. Okay. Thank you. Half an hour having now elapsed. I'm sorry, Your Honor? Half an hour having now elapsed. Yes, Your Honor. That's not very much time to reserve. Okay. We'll hear from the Professor. May it please the Court. David Nevin for Mr. Levitt. And I hope to address the instruction issues that you discussed with counsel leaving for Mr. Parnes, my co-counsel, the cross-appellant issues or the issues that were raised in our cross-appeal. Our view is that Instruction 12 is clearly an incorrect statement of the law. And that it has the vice that was referred to in the Ninth Circuit opinion, the Reynolds opinion. It has the quality of being self-defeating. And in this, it has a peculiar way of unraveling all of the other reasonable doubt instructions, all the references to reasonable doubt that were made in the other instructions, some of which we concede were correct statements of the law. Because what it says is that what that Instruction 12 does is sets up a different concept for resolution of the question of whether the State has proved its case. Well, does it really say that? Or does it, you know, when lawyers and judges go to talk to the public at large and people say things like, you know, why do you have all these, quote, technical rules, search and seizure, self-incrimination, beyond a reasonable doubt, just to protect a bunch of criminals? Why do you have that? And over and over you hear the response, well, we don't do it to protect criminals. We do it to protect everybody in society. We think if we protect the innocent and one innocent and ten criminals go free and one innocent man is saved, it's worth it. Why isn't this instruction kind of that ill? Because saying to the jury, look, presumption of innocence, I mean, the reason  why it's so important is because you don't have to concern yourself with things like, oh, am I going to let a criminal go free? That's not the point. The point of our noble law is to protect the innocent. And by protecting the guilty, we protect the innocent also. Why isn't that all they're telling the jury? And why don't you suppose that's probably why courts all over the country have given that instruction? They think they're protecting defendants, not hurting them. Well, I mean, I don't think that's what the language of that particular instruction says. And I think it may, it might be that it would become important. There are a lot of instructions that are similar to this that are discussed in other cases. And it might be important to look at this specific language, but, which might be different. But I believe this language doesn't say, I mean, it specifically sets up a separate category, that is to say, guilt in fact, a person who is. Maybe the answer is that there are many things, cocktail parties, that are not appropriate for distracting juries. Sure. Well, maybe, maybe that is the exact. But maybe that's not an answer you want to give, so. All right. I'll go with that answer, Your Honor. I didn't want to say that. I, but I mean, I do think. You didn't say that. That's a funny thing to say. And there's lots of stuff we don't tell juries because we don't want them to know the real reasons that we're doing this. And that's okay. But, and I do think that the, that that, that quality of being self-defeating that was referred to in the Ninth Circuit case in 1956. You know, Reynolds helps you not very much at all. And so that explains why we are uncomfortable with it. But the, where the rubber hits the road is Supreme Court opinions. And so what you need to do is persuade us that at the time this conviction became final, whatever point that is, and that is hotly disputed, there was Supreme Court authority that made this instruction obvious. So obviously improper that no jurist of reason would sign on to it. And that's a pretty heavy burden. You first of all have, I mean, Ninth Circuit is often ahead of its time. You're still ahead of our time in many cases. We're still waiting for the Supreme Court to come around. But so maybe in 1956 we had a greatly enlightened view. But it's not clear to me, much as we may be uncomfortable with this instruction, that one can point to Supreme Court authority, even today, that would say, you know, no reasonable jurist could think this instruction was okay. And that's where you need to be. Okay. And I guess I, what I don't understand is why In re Winship combined with Reynolds doesn't get you there. Because, and I think. Wasn't Reynolds our case? Yes. But we can't use our case. Well, I think our case does it. You know, if our case were Supreme Court precedent, then you'd be out of the woods. But we can't use our case. It has to be United States Supreme Court authority. That's the rule. These are the rules of the game. So is there anything before case? I mean, let's say we go with 1989 as a finality. Is there anything, is Winship the only case you've got? Well, I think Jackson v. Virginia. And Justice Scalia cites Kuhl v. United States in Sullivan for the proposition that there's a longstanding requirement that the proof beyond a reasonable doubt is rooted in the Constitution in the Fifth Amendment. Kuhl is a 1972 case. I agree with, I think, the remarks that you made before Judge Reimer that I believe it's both a presumption of innocence and a reasonable doubt instruction. And the requirement for, I mean, the idea that the presumption of innocence is rooted in the Constitution goes back to Coffin v. United States in 1895. And there are subsequent cases as well, Estelle v. But you face the uncomfortable fact that, as Judge Fernandez points out, courts all over the country have said that this instruction is okay. And I find it more difficult to say that, you know, I might be able to say that sort of one court is sort of way out there. And even though they hold this, if all the other authorities are in the way, that no reasonable jurist would go there. But this instruction does have a longstanding tradition, which continues. And I'm not sure whether to believe the – I didn't look at that Connecticut case, but assuming that citation is correct, going all the way to 1999 in Connecticut, saying this is okay. What do we do with that? How do we then say no reasonable jurist could approve this instruction? And I guess I just have two responses to that. One is I think it somewhat overstates the case to say that courts all over the country have ruled that this was a valid instruction. I think courts all over the country have ruled that it was not a valid instruction as well. And I believe counsel sums up the – coded it up at one point and said that 40 percent of the cases which had addressed the question had decided that it was a valid instruction. So I think the weight of it is clearly in favor of the idea that it's not a valid instruction. But I understand that that leaves the point that the Court has raised. I also think that the cases that were – that have been decided – it's not clear to me that the State cases that have been referred to are specifically interpreting or purporting to interpret the Fifth Amendment. But I guess my response to it – and then I guess finally is I think that this instruction very possibly goes farther than the instructions in other cases. I don't want to be – I have not analyzed every one of the cases. And I am not in a position to tell you that that is absolutely so. But I believe at least some of them are not dealing with an instruction that's quite as stark as this one is. These instructions all vary somewhat. For example, the Second Circuit cases that are referred to in Doyle all have a phrasing which is more friendly to the defendant than the one that's – that is present in our case, and I think it's different in some important ways. But I guess finally, the place I get to is that in this instruction, where you say it's not intended to apply to somebody who is in fact guilty, it seems – my suggestion to the Court is that it's such a – it's so starkly inconsistent with In re Winship. It just does away with the requirement for proof beyond a reasonable doubt. And I think that – I mean, I think – How do you decide if somebody is in fact guilty? I'm sorry? How do you decide if somebody is in fact guilty if you've been told this person is only guilty if you prove it beyond a reasonable doubt? Right. And I don't know – Jurors do that all the time. They say, gee, we thought the guy was guilty, but we didn't think so beyond a reasonable doubt. Right. I've had jurors come back and tell me that. Right. And I've – I've had jurors say that, and I've tried cases to judges where judges have said that as well. And I understand the distinction, but, I mean, there's even an instruction in some districts. Didn't the OJ jury say that? We thought he was probably guilty, but not guilty. I don't know. I remember the press conference. I mean, probably guilty is in fact guilty. Right. In fact, the guilt has to be decided beyond a reasonable doubt. But that's not what this instruction says. Well, it doesn't say the contrary at all. Well, it says – But it's not intended for that purpose. Something to that effect. I don't have the exact word in my eye right now. Here's the wording. The rule of law which flows every person accused of a crime with the presumption of innocence and imposes upon the State the burden of proving he's guilty beyond a reasonable doubt is not intended to aid anyone who is in fact guilty to escape. Right. But – But is a humane provision of law intended so far as human agencies can to guard against the danger of an innocent person being unjustly punished. Yes. Okay. And I guess what I'm saying – So you think it's telling the jury if the person's innocent, but you think he's guilty beyond a reasonable doubt, you should find him not guilty. Is that right?  I think it's saying that this business of a requirement for proof beyond a reasonable doubt that I've talked to you about in other places, that doesn't apply if the person's actually guilty or in fact guilty. Now, I agree it doesn't go on to say here's what I mean by in fact guilty. It just leaves that out there as a concept. And I – Really, the reason I'm only – the only reason I'm carrying on at you about other ways of looking at this thing is that it looks to me like what it is is ambiguous. It's not – it indeed does not to me look indeed like an instruction telling the jury never mind reasonable doubt, never mind presumptions of innocence. And by the way, a lot of the presumptions of innocence instructions that have been dealt with by the courts have the same language, basically. I mean, they include the reasonable doubt language along with it. So you can say, well, yeah, telling – a jury is going to think that if I think he's a guilty, that's an instruction, but it's ambiguous. It's not telling the jury that necessarily. I know it can be construed, but it can be construed otherwise also, can it not? I don't see – I mean, respectfully, I don't see how it can be. Okay. I understand. Okay. And again, if – But you really don't have to go that far in your argument. All you can say is that a jury could be misled. The fact that it might be viewed in a benign way does not – or in a way that is neutral doesn't defeat the real risk that a jury will be misled by introducing the concept of actual guilt as opposed to legal guilt. All right. And I – because I think you do have to – if you have an instruction that says it right and an instruction that says it wrong, you have to ask – I mean, the instruction that phrases it correctly doesn't necessarily save the one that phrases it incorrectly, because you don't know which one the jury may have followed. So you have to ask. And the simple answer is that we and a number of other circuits have already said, at least on direct appeal, this is a stinging instruction. Don't give it. Right. Right. And I – So we've already said we don't think it's a good instruction. Whether we said it was unconstitutional is another question. But we said we don't like it. Don't give it. Right. Right? And I – I mean, I – It's a fatigue question. Right. And I got on to it, I think, by way of responding to the Court's question about whether it's a new rule and whether – and dealing with that part of the issue, because, I mean, I think my position that it's – that it is clear affects that part of it now. But I agree – You are in the uncomfortable position that you don't have a Supreme Court case directly on point. Correct. So that raises the ever-present issue in all T cases, which means at what level of generality do you apply the Supreme Court's rule? If you go to the highest level of generality, winship is enough. But we usually require something a little more specific than that from the Supreme Court. And the test seems to be, has the Supreme Court spoken so clearly on this issue that all or virtually all inferior judges in the country can see the handwriting on the wall and say, you know, this is not good? And the problem you have with this, whether it's 40 percent or 33 percent or 27 percent, is that even after winship and even after cage, courts all over the country, although the great weight seems to be to say, no, this is no good, there's still a persistent minority that says this is okay, even after looking at Supreme Court cases after winship and even after cage. So I'm wondering how we are going to conclude that given that lack of virtually unanimity, that nevertheless the rule was so clear from the Supreme Court that, you know, that violates Teague or complies with Teague. I thought of Justice Rehnquist's concurrence in Sullivan in which he said that he referred to the distinction between a deficient reasonable doubt instruction, which was cage on the one hand, and on the other, one in which no reasonable doubt instruction is given at all. And I felt like that was, that is very close to our situation. I understand what the Court is saying. I understand your question about the existence of other cases being there. You really, I mean, what the district court here did was it didn't really rely on the naked 12 instruction. It looked at the constellation of instruction, at the grouping of instructions dealing with reasonable doubt and presumption of innocence and concluded that sort of looking in tandem with 12 being the worst and some of the weaknesses in the other ones, that resulted in a concoction, a brew that is, that violates due process. And the beauty of that, from your perspective, is that it's hard to find another sort of jurist that could view this entire brew in exactly this fashion. So you can't say, gee, look, there are all these other reasonable jurists that are going to do it the other way. The case becomes too generous in a way, and you don't then confront the problem of these inconsistent cases from all over the country. Right. And I do think that there are, not only considering this instruction but others, but the others as well, I think there are distinctions between the specific language of this case and the cases, the other cases around the country that have dealt with the same general idea. Do you want to touch on Tyler? Now, you cited the dissent in Tyler, but let's pretend that we really should be looking at majority. I understand what Tyler did not do. Right. Actually. But when one looks at Tyler, does that give you any concern about whether this would comply with Teague? The Court seems to have some doubts that even the Cage-Sullivan tandem would meet Teague's requirement. Well, I guess I see Tyler as an AEDPA case. I know Justice Scalia is in the majority in Tyler and wrote Sullivan. I have to think that Justice Thomas articulates it. I just have to take it at face value. I don't think it, I think it, as the Court mentioned before. Well, if we take it at face value, then the Court says you've got to know that structural error isn't, is not really bedrock Teague. You may think that's strange, and Justice Breyer did. Yeah. But even if it's structural error, you may not meet the Teague requirement. May not. Well, and finishes off by saying at the end of this disquisition that it is unlikely that any watershed rule, Teague meeting rule, has yet to emerge. That's pretty strong language. In the context of what Sullivan and Cage were talking about especially. That's pretty strong language, isn't it? It is pretty strong language. And that's by the majority of the Supreme Court. And I know that we can call it dictum, but I think we've been warned that almost there's, there might be such a thing as Supreme Court dictum, but they'll tell us when it's dictum, and us folks had better consider it pretty special stuff anyway. Yes, I understand. And I guess I can, I think I can really mostly take, resort in the proposition that it is dictum, that it is, that it hasn't resolved into a ruling yet. And I, it seems, and I think Justice Breyer, in other words, the idea of a bedrock principle, it seems to me that if you work those concepts correctly, you end up with there being no idea of watershed, I mean, of there never being a watershed, it wouldn't be possible. That might be what, that might be where they're going. We don't know that. But they do, they do say quite directly, never mind, never mind the dictum part of it, they do say quite directly that the fact we say something is structural error does not mean that it meets the T exception. Does not on its face. That's not the end of the story. But that doesn't, I mean, that wouldn't mean that it couldn't. A holding that a particular error is structural does not largely dictate that it meets the T. So you can have structural error, actually, which Sullivan and Cage were talking about, I suppose. Well, Sullivan was talking about. Right. And yet you haven't met T. Right. And, but that would be possible. Well, yeah. Right. And, by the way, nothing has yet. Now, that's a bit of an overstatement, I believe. I think it is. But we don't get to say that to the Supreme Court. Right. But I think this Court does, I mean, I think until the Supreme Court overtly rules, makes a ruling of that sort, that this Court has to view that as dictum and to continue to deal with the idea of watershed exceptions and structural error in a way that seems to flow out of the earlier decisions. I mean, I think it would be, I'm not sure what it does if you say there is no such thing as a watershed exception and there is that would satisfy Teague. I mean, I think. Oh, certainly. We have to keep looking. Can you tell me, let me just phrase the question somewhat differently. I can easily understand why, let's say Cage, because it's easier to identify, adds to the accuracy of trial, the Cage rule. Yes. Or the rule of which you're contending, which is essentially analogous. But I don't, I'm not sure I logically see what bedrock understanding of procedure that the rule that you're contending for would alter our understanding of. The requirement for proof beyond a reasonable doubt. I mean, I think that's the bedrock procedure. I agree, but what's altering it about it? Well, this instruction. Well, if the instruction, if the instruction does not, if the instruction allows the jury to convict on some basis other than beyond a reasonable doubt, then it's Winship error. Right. But what's new about that? Oh, well. How does that alter our understanding of the bedrock principle of proof beyond a reasonable doubt? It's just saying this instruction can be understood as doing that. Right. What's bedrock about that? I mean, it's a big deal, in other words. It is a big deal to Mr. Levitt. Yes. But what is a big deal about it in terms of our general understanding of the world? And I feel like this, I'm in kind of the place that Justice Breyer was referring to when he said, when he spoke about the idea that you might have a rule that's too new for Teague, but not new enough for a watershed exception. But the watershed exception, I mean, they haven't said so, but I mean, one would assume that it's quite watershed to say in this country, State and Federal courts alike, proof in a criminal trial of guilt must be beyond a reasonable doubt. That's watershed, right? In 1907. Well, it still is. I mean, it is a watershed rule. There's no question about it. So is Gideon, and that was in 19 whenever it was. Everybody seems to think that was a watershed rule. Right. All I'm saying is if the rule for which you are contending, what is watershed about it? It's simply saying that in this case, on these instructions, in this discrete situation, we believe these jurors reasonably could have construed the instructions as a whole as allowing them to convict on a standard of persuasion less than beyond a reasonable doubt. Right. And I mean, I'm inclined to agree with that. I don't think it's a new rule. And I guess to state it simply, I would say I think it's a What's watershed about it? Well, I mean, I think if it is a new rule, then it's watershed. And I think, but I actually don't think it is a new rule. I'm just trying to ask you why. Why I think it's watershed. If it's, well, if it's a new rule, if this has never been, this is not a rule of law that has been announced previously, then I think it becomes watershed. Because? Because it goes to this bedrock principle of the requirement for proof beyond a reasonable doubt. You just said that that was the bedrock principle. Now we're establishing a new bedrock principle. Well. And the new bedrock principle is what? Well, no. I think we are articulating, we're articulating, we're understanding the bedrock principle requirement for proof beyond a reasonable doubt. Okay. And may I give four minutes to my co-counsel at this point? You know, are you going to talk about the instructions of the honor, though? Was it covered by the COA? I'm sorry? Was it covered by the COA? Yes. Tell me where? Well, it was part of Claim 11, if I'm not mistaken. And I don't have it right in front of me, but I believe it's part of Claim 11. You're correct. And Judge Wendell, the certificate of appealability clearly said we could appeal Claim 11. And okay. Go ahead. On the question of procedural default, invited error and all that. Well, we, the Idaho Supreme Court doesn't have an invited error doctrine with respect to jury instructions. The judge has an independent, under Idaho law, has an independent obligation to instruct fully on the law as, on the proper law of the jury, even if you don't. And in many cases in state court, litigants, in criminal cases at least, litigants don't submit requested jury instructions. And it may be the same everywhere. But the judge has an independent obligation to instruct correctly on the law. And as a result, the Idaho Supreme Court has ruled that there is no invited error with respect to jury instructions. Well, we'll let your co-counsel speak. All right. Thank you. Please, the Court. Andrew Pars, I'll try and be brief. If I may pick up on that, that last issue about invited error, because it's related to the issue of ineffective assistance of counsel on appeal, that the Court ruled initially that these claims were not, were not defaulted, or they were defaulted, but it doesn't matter because we're going to reach all those claims on the merit. And it included a challenge to the reasonable doubt instructions and the alibi instruction. And so the Court ruled initially that it was not defaulted and, therefore, would be reached on the merits. And then after making that decision, when it reached the merits of it, it said it is a wrong instruction, it's a constitutional violation, but because it is invited error, we're not going to, I'm not going to grant relief on it. And so the question then is, is invited error, is there some concept of invited error that is other than State procedural default? And there is no, there was no procedural default finding that the State had said, we're not going to look at it. Well, the State has just said they're not raising procedural default. Right. And so then the question then becomes. Or exhaustion. And then the only question is whether there is an independent rule of Federal habeas that says we're not going to look at invited error, even if the State court looked at it. So it's an unusual situation. It's not the same situation as any of the cases that were relied upon in, by the district court or by the State. The State did not adopt invited error. What they're asking is that this Court adopt a concept of invited error for Federal habeas, and no court has done that independent of looking at what the State has said. Let me be brief. I have about two minutes on heinous, atrocious and cruel instruction, because I think this, the Ninth Circuit has not had to face this directly in Pizzuto and in Hoffman. It was able to assume error. And in this case, it is the only aggravator. The role of the aggravators in Idaho is an eligibility determination. In Godfrey, Walton, Creech and Jeffers, the standard is to look at clear and objective standards that provide specific and detailed guidance to make rationally to make a rational review of the process imposing death, appellate review. In this, in these cases, the statute itself is conceded to be facially vague. In this case, the second prong, the second part of the element of heinous, atrocious and cruel is concededly unconstitutional. What the argument is, is that just because it's part of this eligibility element that that's enough. It's as if to say you have two elements of an offense. One element is unconstitutional. It's enough that the other element isn't unconstitutional. In this case, what the Idaho courts have defined is simply that the act, a set of acts setting the crime apart from the norm of murders and that its commission manifests such depravity as to offend all standards of morality and intelligence. Those are the kind of pejorative adjectives that Justice O'Connor in Creech said describe the crime as a whole and are unconstitutionally vague. I think if the Court reaches this issue, it has to say that those standards are so vague that they are no standards at all. And Judge Fletcher, in her dissent in Pazuto, looked at the lay of the land, the cases that came out of Idaho, and really what they, what Justice Fletcher found was that there was, they had abandoned any narrowing, that the courts looked to issues of what sets the standard itself as articulated by the Idaho court is narrowing enough, then I believe the Supreme Court said it is inappropriate to look at other cases to see whether the State has consistently applied that. And I agree that is the standard. It's an interesting exercise, but if indeed the standard articulated by the court and purportedly applied by the court is narrow enough, then we look at the case at hand. Right. But the question is, is the language that the commission of the offense manifests such depravity as to offend all standards of morality and intelligence, is that narrow? Is that any narrower than manifesting exceptional depravity? It doesn't set up specific guidelines. It does not, it does not set up as in Walton or Jeffers or any of those other cases specific guidelines. Now, granted, there is part of it that talks about being a conscienceless, pitiless crime that is unnecessary torture for the victim. But that is only one part of the definition, and that is not the only part that is looked at by the Idaho courts and the Idaho Supreme Court. It's conjunctive, though, isn't it? Excuse me? It's conjunctive. It is conjunctive. So if I say, here's how we're going to narrow it. We're going to narrow it with A plus B plus C. And A is sufficient to narrow it for Federal constitutional purposes. Grant me that for a moment. And then they add plus B, and we think, oh, that's sort of mushy, and they add plus C, and we think that's sort of mushy. So what? The fact is, you've got to clear A, and once you've cleared A, you're into constitutional land, are you not? There would be no – there would be – if that's the approach, then there would be no distinction between all the cases that look at the disjunctive. Walton is disjunctive, and so each one has to be met. In this case, if the requirement – for example, if the requirement was – Sure, disjunctives are obviously different. If I say I can whack you for A or B or C, and we don't know which one I use, and B and C are no good, well, sure. But there is a difference, even in modern grammar, between and and or. And sometimes courts don't recognize it, but most people think there's a difference. There is clearly a difference. But if the instruction said you had – if you killed a police officer and were African American, you would be eligible for the death penalty. And that was the standard that was used. And the court said, this is the standard we're applying, and that's it. And the court said, no, no, you can't use the second one. Then is the default junction – the default one enough? Because the court is not making its decision on that narrowing. Sure. You've chosen one that's obviously – that is unconstitutional in itself. But suppose you said what you said, and instead of African American on the end of it, you said, and we just think from your background you're a mean person. And we think you're a mean person. What happens is, is that because that is what is being used by the courts, and it's what has been used in Idaho to find both – Yes. But it's not just about the fact that it was used in Idaho to find both African   I just want to make that clear. The people sentenced under that would be entitled to be resentenced under one that only narrowed by the constitutional. I understand your point. Thank you. I did not. Maybe you could cancel cancer. I did not find in the it was a more than one certificate of appeal ability in the case. There was an April 17th order. April 17th. Is that the order? I believe that is. You said Claim 11 was certified? Yes. I mean, the Statements Brief said it's not certified. I looked in the red brief. I did not see a response to that. This is on Instruction 39, the burden shifting. The certificate of the motion for certificate of billability requested on Claim 11, specifically on the issue of the instruction, on the alibi part of it, which we had not been successful on. And the certificate of appealability in the last page says I'm granting a certificate of appealability on Claims 1 through 6, I believe, and 8 through 11. I believe that's at about page 1. Oh, 8 through 12. 8 through 12, excuse me. And 11 is in there. So we believe that we had a certificate of appealability, and I think the Court has to self-fine it. Okay. Okay. It's not in the discussion part of the order. It's not in the discussion part of the order, but it did not discuss all of the other issues. Okay. Got it. Thank you. Thank you. Very quickly, Your Honors, I wish to apologize to the Court and to counsel, because in our brief we did indicate that counsel had not requested, not even requested, a certificate of appealability on the question of Instruction 39. In fact, they did. It is our position, though, that the district court did not grant one because there was no discussion in the certificate of appealability. Well, it does say 8 through 12, right? And I realize what it says. I was looking at the order. I didn't see any discussion of 11. But I didn't read the last paragraph. There is none, Your Honor. There is no discussion anywhere. But it does say 8 through 12. It does say that. And 11 is the claim in question. Yes, Your Honor. It is, Your Honor. So ---- Because there was no discussion, I just ---- we don't believe that the intent of the Court was to grant one on that. Above and beyond that, Your Honor. But it's sort of jurisdictional. I mean, either it did or it didn't. If you think that the district court erred or made a typographical error or anything of that sort, the way to deal with it is to petition the Court for clarification or redaction or correction of the order. But I'm sorry. Given that it says the certificate is granted as to that claim, is there an argument left that there isn't? The only argument that I have, Your Honor, is that there was no discussion of the claim. Is there any requirement that the Court discuss a claim? Not that I know of, Your Honor. Okay. Okay. On the issue of heinous, atrocious and cruel, Your Honor, Your Honors, Judge Fernandez, I think your example is exactly right. I do not understand how, when the function of a limiting instruction or a limiting discussion by the Idaho Supreme Court that, in part, is specifically approved by the United States Supreme Court, can somehow, because there's another part of it that may or may not be vague, eliminates and makes the entirety of that particular aggravator unconstitutional. It simply does not make sense to me that we have that part of it that is good and because the purpose of those is to narrow the individuals that are eligible for the death penalty. We have done that with the first part of that particular aggravator. And we've done it constitutionally pursuant to the United States Supreme Court. And somehow, if we chop this off, if we would have chopped this off, we're now constitutional, but because we left it on, we're not, there just is an inherent inconsistency in that entire argument. I think that even the, I believe it's the Moore decision, and the Eighth Circuit has at least in dicta, they imply that. They state that it was wrongly decided and that they probably should have given more credence to Judge Gibson's dissent in Moore 1. And we would submit, Your Honors, that there is absolutely nothing wrong with the heinous atrocious and cruel aggravator as far as it has been limited by the United States, or the Idaho Supreme Court, that it is perfectly fine past this constitutional muster. If there are no other questions, we would ask the Court to reverse the District Court as to this claim raised in the State's appeal, and affirm the District Court in those claims that were raised on the prosecutor. Thank you. Okay. Thank you. Kezia Sargi, we'll stand for a minute. We're adjourned.
judges: Kozinski, Rymer, Fernandez